UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 5:10-CV-131-KSF

ELIZABETH ANN WIMS, et al.                                                   PLAINTIFFS

vs.                                     **OPINION AND ORDER**

KENNETH NOBLE POWELL, et al.                                    DEFENDANTS

\* \* \* \* \* \* \* \*

This matter is before the Court on Plaintiffs' motion to remand [DE 5] and Defendants' partial motion to dismiss [DE 3]. For the reasons discussed below, Plaintiffs' motion to remand will be denied, and Defendants' motion to dismiss will be converted to a motion for summary judgment, which will be granted.

**I.    BACKGROUND**

Plaintiffs filed this action in the Madison Circuit Court against Richmond Senior Community, LP; Morning Pointe of Richmond, the d/b/a of Richmond Senior Community; Independent Healthcare Properties, LLC; and Kenneth Powell, a supervisor at Morning Pointe. Plaintiffs are all former employees of Morning Pointe who allege that Powell and Morning Pointe violated the Kentucky Civil Rights Act ("KCRA") by discriminating against them on the basis of their race. Plaintiffs further claim that Powell committed outrage/intentional infliction of emotional distress by discriminating against them.

Richmond Senior Community, LP and Independent Healthcare Properties, LLC are citizens and residents of Tennessee, as are all of their members. Powell is a citizen of Kentucky. Defendants removed the action to this Court on the basis of diversity jurisdiction, claiming that Powell was fraudulently joined to defeat diversity. In support of their claim of fraudulent joinder, Defendants argue that there are no facts to support Plaintiffs' claims of outrageous conduct by

Powell and that Plaintiffs cannot recover against Powell for violation of K.R.S. 344.040 due to preemption. Defendants further argue that Plaintiffs' claim for race discrimination/hostile work environment against Powell also must fail under the KCRA, as supervisors who do not qualify as employers are not personally liable under the KCRA.

Anticipating that this Court would determine it has jurisdiction by reason of fraudulent joinder of Powell, Defendants moved to dismiss the claims of outrage against the remaining Defendants for failure of proof. Plaintiffs' claims of racial discrimination against their employer are not the subject of the present motions and are not considered herein.

## II. FRAUDULENT JOINDER

"When a non-diverse party has been joined as a defendant, then in the absence of a substantial federal question, the removing defendant may avoid remand only by demonstrating that the non-diverse party was fraudulently joined." *Jerome-Duncan, Inc. v. Auto-By-Tell, L.L.C.*, 176 F.3d 904, 907 (6th Cir. 1999) (quoting *Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851 (3d Cir.1992)). It is well established that the burden of proving fraudulent joinder of a non-diverse defendant is on the removing party. *Alexander v. Electronic Data Systems Corp.*, 13 F.3d 940, 948-949 (6th Cir.1994).

"To prove fraudulent joinder, the removing party must present sufficient evidence that a plaintiff could not have established a cause of action against non-diverse defendants under state law." *Coyne v. American Tobacco Co.*, 183 F.3d 488, 493 (6th Cir.1999). If there is a colorable basis for predicting that a plaintiff may recover against a non-diverse defendant, this Court must remand the action to state court. *Id.* The test is not whether the defendants were added to defeat removal but "whether there is arguably a reasonable basis for predicting that the state law might impose liability on the facts involved." *Alexander*, 13 F.3d at 949 (citation and quotations omitted). All disputed questions of fact and all ambiguities in the controlling state law should be resolved in favor of the plaintiff. *Id*.

### A. Intentional Infliction of Emotional Distress

Under Kentucky law, the tort of intentional infliction of emotional distress, also called "outrage," has four elements:

> [That] the defendant's conduct was intentional or reckless, that the conduct was so outrageous and intolerable so as to offend generally accepted standards of morality and decency, that a causal connection exists between the conduct complained of and the distress suffered, and that the resulting emotional distress was severe.

*Brewer v. Hillard*, 15 S.W.3d 1, 6 (Ky. Ct. App. 1999), citing *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 2-3 (Ky. 1990). The Defendants argue that the Plaintiffs have failed to allege conduct which would be considered "outrageous" under Kentucky law and have failed to allege severe emotional distress. The Court will not reach the issue of whether the allegations concerning mental distress are sufficient, because the Court finds that Powell's alleged behavior does not meet the standard for outrageousness set by Kentucky courts.

Each Plaintiff except Hill has submitted a sworn affidavit in addition to the Amended Complaint. This Court will consider the affidavits, which clarify the contents of the Amended Complaint. A summary of the affidavits, those parts of the Amended Complaint not discussed therein, and those parts of the Amended Complaint pertaining to Hill follows:

The Amended Complaint alleges that Powell became the Plaintiffs' supervisor in April 2009. [Amended Complaint ¶ 14]. Wims' affidavit [DE 5-1] states she was employed at Morning Pointe for six years. She recently held the title of dietary manager. In 2009, Powell provided her a list of items to be improved on and gave her thirty days to improve. A week and a half later she was fired without explanation. She had never before been reprimanded during her employment at Morning Pointe. She was replaced by a white employee. A number of white employees were not disciplined for poor performance, including one whom Wims reported for sleeping on the job. Once, when working in the dining room, a resident used a racial epithet as a replacement for a word in a children's rhyme said directly to Wims. Wims reported this to a managerial employee, who reported it to Powell. Powell took no action. In another incident in the dining area, a resident

asked Powell if Powell would allow any black residents in the facility, implying that would be unwanted. Powell did not correct that behavior. In a third incident, a hard-of-hearing resident who consequently speaks loudly was seated outside Powell's office. The resident said in a loud voice that "we're getting too many coloreds around here." Powell took no corrective action. Wims states that the conduct "caused [her] extreme emotional distress and anxiety." Said anxiety caused her "major weight loss," required the prescription of "additional anxiety medication" and required an increase in doctor's appointments from once every three to six months to a minimum of once per month.[1] [DE 5-1]. The Amended Complaint also mentions that, in spite of Wims having excellent prior performance, Powell "repeatedly told Wims her job was too much for her and that she would be better suited to lesser work." [Amended Complaint, ¶ 26].

Jackson's affidavit states she was employed as a resident assistant at Morning Pointe from September 2008 to April 2009. [DE 5-2]. Jackson was "written up"[2] by Powell for calling in sick without finding a replacement for that shift. White employees in similar situations were not disciplined. Powell did not discipline three white workers who were caught smoking in violation of the zero-tolerance policy. Jackson "knew [she] would have been fired if it had been [her]." Powell also wrote Jackson up for throwing a knife at someone while serving food, an incident which Jackson denied occurred. Jackson feared Powell would try to take her "CNA." Jackson states Powell's conduct caused her extreme emotional distress and anxiety. She "hated to come into work" and "never knew when Powell might target [her] for something." [DE 5-2]. The Amended Complaint also alleges that Powell refused to process paperwork necessary for Jackson to obtain full-time employee benefits, whereas such benefits were provided to whites. [Amended Complaint, ¶ 33]

---

[1] Wims prior doctor's appoints and medication indicate that she already suffered some form of anxiety, but at a lesser degree of severity.

[2] Presumably, a written reprimand or negative performance evaluation.

4

Watts' affidavit states she was employed as a resident assistant at Morning Pointe from September 2008 to January 2010. [DE 5-3]. Watts had been doing similar work for thirty-nine years. During her time at Morning Pointe she had not received any complaints or "write-ups" until Powell arrived. Powell altered the method of serving food by assigning tables numbers and setting a specific order for service. When the kitchen sent out a plate for a resident, Watts served it. Powell then entered the kitchen and berated her in front of the other staffers, "claiming the whole lunch was a mess and blaming [Watts]." Powell left the kitchen and returned a few minutes later, then "yelled at [Watts] until [she] started to cry." Other individuals present noticed Watts appearing upset, and asked if she was all right. An hour after this, Watts was written up. White servers and the white kitchen staff who caused the error were not blamed or written up. In another incident, Watts' white co-worker went on a break, and during this time, three residents requested assistance. When Watts could not assist all of them, Watts was written up, but the white worker was not. Following repeated "write-ups," Watts' employment ended on January 22, 2010. [Amended Complaint ¶ 48]. Watts' co-workers and residents[3] asked for her to stay,[4] but Powell replied he had already hired someone. That new employee was white. Watts claims she suffered "extreme emotional distress and anxiety," and that she dreaded coming to work. She states that she loved her job, but feared being targeted "at any time" by Powell during the week, and that she was "a nervous wreck" during such time, as she "never knew what he might do." [DE 5-3].

Hocker's affidavit states she was employed as a resident assistant at Morning Pointe from September 2007 to June 2009. [DE 5-4]. On Powell's first day of work, he reprimanded her in front of other workers for not wearing a hair-net, although no other workers besides the cooks wore hair-nets. Powell "berated [Hocker] to the point that other workers came up to [her] and asked if [she]

---

[3] Presumably, those residents for whom Watts had responsibilities on a frequent basis.

[4] Presumably, remain employed at Morning Pointe.

5

was ok." Someone[5] added Hocker's name to the work schedule for a certain day without her knowledge. Powell called her and told her to come in to work. When Hocker could not comply, Powell became angry. When she returned to work, "someone[6] had spread a rumor that [she] had quit [her job]." Hocker was written up for an unannounced absence. She had never been subject to discipline for anything of this nature previously, and was upset at being scheduled without her knowledge and then reprimanded. When Hocker spoke to another worker about Powell's plan to charge residents for meals delivered to their rooms, she was reprimanded for arguing in front of residents, but those to whom she had been speaking were not reprimanded. Finally, Hocker was fired for missing a "mandatory" meeting of a sort that had characteristically low attendance rates, while a white worker who was also absent was never written up. Hocker alleges that Powell's conduct caused her "extreme emotional distress and anxiety" and that she felt "at every turn, Powell belittled [her] as a person." She prayed in her automobile every morning that she would not be reprimanded that day. [DE 5-4]

Mitchell was employed at Morning Pointe as a nurse's aide from August 2006 to August 2009. On one occasion a traffic cone was placed in a resident's room as a test to see if the room was being checked appropriately. When she did not report it, she was written up,[7] although a white nurse's aide, also responsible for room checks and who also did not report the cone, was not reprimanded. Mitchell was aware that "he"[8] performed similar tests on other black workers. In another incident, Mitchell was on a smoke break with a white nurse's aide when Powell attempted to contact them via telephone. However, the nearby phone was not functional. Powell "verbally

---

[5] This person is not identified in the affidavit or Amended Complaint.

[6] This person also is not identified.

[7] No name given in the affidavit; the person who wrote up Mitchell is identified as "he." Powell's name is not mentioned until DE 5-5 ¶4. This Court will give the Plaintiff the benefit of the doubt and assume that "he" refers to Powell.

[8] Same as n. 7.

abused [Mitchell] over the incident, calling [her] a liar." Mitchell was fired for failing to answer the phone call, but the white nurse's aide was not. Mitchell had never been fired before that. Mitchell states that Powell's conduct caused her "extreme emotional distress and anxiety." [DE 5-5].

Martin was employed as a "CNA" at Morning Pointe from October to November 2009. Martin had standing instructions not to open exterior doors after 7:00 p.m. except for third-shift employees or residents returning with their families. In one instance, the buzzer for the front door sounded after 7:00 p.m., and Martin continued to perform other duties for approximately five minutes before opening the door. A white co-worker did not attempt to open the door during this time. Powell wrote up Martin for not answering the door fast enough, but not the white employee. Martin states that Powell typically addressed reprimands to white employees in private, but publicly "humiliated and reprimanded" black employees. In another instance Powell called Martin a liar "in a loud, demeaning voice" in front of other employees. Martin states that Powell's conduct "caused [her] extreme emotional distress, anxiety and reduced [her] to tears." [DE 5-6].

Wright was employed as a cook at Morning Pointe from June 2009 to December 2009. She has worked in food service for 28 years. Wright was fired without warning for sending out cold food, although she prepared all items at the correct temperature. Another employee had sent out the food. No other kitchen employee (all of whom besides Wright were white) was reprimanded or fired. This was the first time Wright had been fired. She states Powell's conduct caused her "extreme emotional distress and anxiety." [DE 5-7].

Hill was contacted about applying for work at Morning Pointe and applied for an aide position. After an interview, she was told she was hired. Subsequently, Powell was hired as supervisor. Hill reported to work and began to assist in moving a patient. Powell requested an interview, and told Hill he would make a decision about Hill's employment and call her. He never called. The Complaint states that Hill "did suffer emotional distress and mental harm and anguish." [Amended Complaint, ¶¶ 59-65].

7

The Plaintiffs have not alleged conduct that meets the high bar set by the Kentucky courts for outrage. Outrageous conduct "offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved." *Craft v Rice*, 671 S.W.2d 247, 249 (Ky. 1984). The "generally accepted standards of decency and morality" have been determined to be difficult to offend, as Defendants correctly argue. The Kentucky Supreme Court adopted the Restatement (Second) approach:

> It has not been enough that the defendant has acted with an intent which is tortious ... or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice....' *Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.*" Restatement (Second) of Torts, § 46 Comment d.

*Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990) (emphasis added by the Kentucky Supreme Court). In *Seitz*, a mother who delivered a stillborn child was told to "shut up" and that her baby would be disposed of in the hospital. *Id.* The Court found that such conduct was not "outrageous," and denied other aspects of the patient's claim as negligence (e.g. delay in arriving at the patient's room). *Id* at 3-4.

The Plaintiffs rely heavily on *Wilson v. Lowe's Home Center*, 75 S.W.3d 229 (Ky. Ct. App. 2001), in support of their position. That case, like the case before this Court, involved racism as the main factor in an outrage claim. However, the facts of *Wilson* are readily distinguishable, both in nature and severity. Wilson was allegedly "subjected to racial remarks on a nearly daily basis by his coworkers and supervisors for a period of approximately *seven years*." *Id.* at 238 [emphasis added]. Such remarks were blatantly racist insults, rather than a discrepancy in treatment between Wilson and white co-workers. *Id.* at 237-238. These comments included that the insults were Wilson's "penalty for being born black," that no reason was needed to hang an African-American, that Rodney King "needed his black butt whipped," that Jeffrey Dahmer was one of the few white people who "liked dark meat," that neither Wilson nor any other African-American would ever be

8

a store manager at Lowe's, and that "blacks can't read." *Id.* That court found that a jury could reasonably determine such highly offensive conduct over the long period of time was outrageous.

Here, however, Powell's alleged conduct falls far short of the behavior found to be actionable in *Wilson*. Each Plaintiff had a few unpleasant interactions with Powell, but none were ever subjected to years of racially-charged insults and indignities. The only racial epithets any Plaintiffs mention were those directed at Wims by *residents*, not Powell [Amended Complaint ¶ 25; DE 5-1 ¶¶ 3-5]. The other instances of Powell's behavior involved unexplained firings, hidden object tests, harsh verbal reprimands, or unjustified disciplinary actions, which occurred on a comparatively infrequent basis over a far shorter time span.

The Plaintiffs also argue that their claims are similar to those in *Kroger Co. v. Willgruber*, 920 S.W.2d 61 (Ky. 1996). Willgruber, who had been wrongfully terminated from Kroger, was then subjected to a series of events intended to fracture him emotionally until he signed papers releasing Kroger from liability. Following his termination, Kroger sent Willgruber to Anderson, South Carolina, promising employment there but knowing full well that none was available. Kroger then learned Willgruber, whom Kroger knew was mentally disturbed, suffered a full breakdown. Nonetheless, Kroger pressured Willgruber again to sign the release, and also telephoned the South Carolina company to inform them (falsely) that Willgruber had no interest in employment there. Kroger then convinced the disability insurer, which had determined it was legally obligated to pay Willgruber disability benefits for his depression, to delay payments to pressure Willgruber to sign the release of liability. Kroger did so by falsely alleging to the insurer that Willgruber was faking, had employment elsewhere, and stating "items of a personal nature so derogatory to Willgruber and his family that they are unworthy of repetition in a published opinion." *Id.* at 66. The insurer's own examining physician had to engage Willgruber in a non-suicide pact before ultimately granting benefits. Kroger, *upon learning of this*, pressured the insurer to place Willgruber under

9

surveillance, in another attempt to defeat Willgruber's disability benefits and force him to sign the release. *Id*. at 66-67. The court found this conduct to be actionable. *Id*.

Taking the Plaintiffs' allegations as true in the present case, Powell did yell at, berate or otherwise insult some of the Plaintiffs, and he reprimanded and even fired some of them in situations where white co-workers were not subject to any repercussions. Yet nothing in the Plaintiffs' affidavits or the Amended Complaint accuses Powell of conduct coming close in severity to Kroger's systematic attempts to shatter the emotional state of an already-depressed individual.

*Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781 (Ky. 2004), provides the most concise summary of existing outrage cases:

> Kentucky courts have found plaintiffs' proof of outrageous conduct sufficient to support an outrage/IIED claim in cases where the defendants: (1) harassed the plaintiff "by keeping her under surveillance at work and home, telling her over the CB radio that he would put her husband in jail and driving so as to force her vehicle into an opposing lane of traffic"; (2) intentionally failed to warn the plaintiff for a period of five months that defendant's building, in which plaintiff was engaged in the removal of pipes and ducts, contained asbestos; (3) engaged in "a plan of attempted fraud, deceit, slander, and interference with contractual rights, all carefully orchestrated in an attempt to bring [plaintiff] to his knees"; (4) committed same-sex sexual harassment in the form of "frequent incidents of lewd name calling coupled with multiple unsolicited and unwanted requests for homosexual sex"; (5) was a Catholic priest who "used his relationship [as marriage counselor for] the [plaintiff] husband and the wife to obtain a sexual affair with the wife"; (6) agreed to care for plaintiff's long-time companion-animals, two registered Appaloosa horses, and then immediately sold them for slaughter; and (7) subjected plaintiff to nearly daily racial indignities for approximately seven years.
>
> Outrageousness has been found lacking, however, in less-egregious cases where the defendant: (1) refused to pay medical expenses arising out of an injured worker's compensation claim; (2) wrongfully converted the plaintiff's property in a manner that breached the peace; (3) negligently allowed his vehicle to leave the road and struck and killed a child; (4) committed "reprehensible" fraud during divorce proceedings by converting funds belonging to his spouse for the benefit of defendant and his adulterous partner; (5) wrongfully terminated the plaintiff; (6) displayed a lack of compassion, patience, and taste by ordering plaintiff, who was hysterical over the fact that she had just delivered a stillborn child in her hospital room, to "shut up" and then informing her that the stillborn child would be "disposed of" in the hospital; (7) erected a billboard referencing defendant's [the billboard was targeted at the plaintiff, who was a criminal defendant] status as a convicted child molester; (8) wrongfully garnished plaintiff's wages pursuant to a forged agreement; and (9) impregnated plaintiff's wife.

*Id.* at 789-791, (internal citations and footnotes omitted). The court noted that it had set a very high bar for outrageous conduct, such that the vast majority of behavior would not qualify. *Id.* at 791. *See also Pierce v. Commonwealth Life Ins. Co.,* 825 F. Supp. 783 (E.D. Ky. 1993) (no liability where defendant's employee demoted the plaintiff while commenting that he "might as well have been a murderer, rapist, or child molester," among other crude, sexually explicit remarks); *Allen v. Clements*, 920 S.W.2d 884 (Ky. Ct. App. 1996) (erecting a billboard stating "danger – child molester in community" not sufficiently outrageous); and *Humphress v. United Parcel Service, Inc.,* 1998 WL 869985 at *1, *3 (6th Cir. 1998) (not outrageous when plaintiff, who filed a labor grievance, was subjected to a "campaign of harassment" by co-workers, including (1) grease placed on parts of his truck; (2) obscenities on his windshield; and (3) a defaced picture of his daughter).

All of Plaintiffs' allegations of Powell's behavior fall short of the conduct in *Stringer* in which the manager allegedly secretly taped employees, detained them, wrongfully accused them of theft both to their faces and to other co-workers, terminated their employment, escorted them from the premises, attempted to deny their unemployment benefits, and used the surveillance footage to train other employees, all as an attempt by the manager to avoid demotion by reducing payroll expenses. The manager's actions were held not to be outrageous. *Stringer*, 151 S.W.3d at 787. Powell's actions, whatever his motives, were considerably less severe. Consequently, the Plaintiffs' claims for intentional infliction of emotional distress fail.

This Court has not found any authority to support Plaintiff Wims' contention that failing to "correct" the usage of a racial epithet by a non-employee is outrageous, even in the context of Powell's pattern of conduct. The most closely analogous case is *Epelbaun v. Elf Atochem, North America, Inc.*, 40 F.Supp. 2d 429 (E.D. Ky. 1999), aff'd 225 F.3d 658 (6th Cir. 2000) in which the court found that *employees*' infrequent ethnic (Polish) jokes and statements were, while distasteful and inappropriate, not outrageous. The residents' racial comments to Wims here were

11

inappropriate and inexcusable, but could not result in liability for the speakers, much less upon Powell for taking no responsive action. None of the other events Wims discusses rises to actionable levels of outrageousness. Wrongful termination, being told her job was too difficult for her, etcetera, are insufficient in their severity – even when taken as a pattern – to allow recovery under Kentucky law for outrage. *See Stringer*, *supra*.

Jackson, likewise, offers no allegation which, if true, may be considered actionable for intentional infliction of emotional distress. Powell's alleging that Jackson threw a knife at a resident is likely to be the most egregious of his actions in regard to Jackson, but simple slander is generally insufficiently outrageous and intolerable for intentional infliction of emotional distress. See *Stringer, supra*, (allegation of theft not outrageous even though slanderous or libelous per se). Taken in context with Jackson's other allegations, such as a differing attendance policy for her and her white co-workers, Powell's misdeeds would still not rise to the level of actionable outrage. The remaining Plaintiffs allege, variously, differences in their treatment compared to white co-workers; unjustified written reprimands; loud, public and/or demeaning verbal reprimands; and unlawful termination or discriminatory hiring practices, none of which constitute outrage under Kentucky law.

### B. Preemption of Claims Under the KCRA

Plaintiffs also allege Kentucky Civil Rights Act claims against Powell under K.R.S. 344.040. The Defendants correctly asserted in their Notice of Removal that "individual agents or supervisors who do not otherwise qualify as employers cannot be held personally liable in their individual capacities under KRS Chapter 344." *Conner v. Patton*, 133 S.W.3d 491, 493 (Ky. Ct. App. 2004) (citing *Wathen v. General Electric Co.*, 115 F.3d 400, 404 (6th Cir.1997)). *See also Walker v. MDM Services Corporation*, 997 F.Supp. 822, 823 (W. D. Ky.1998) (An individual supervisor who does not qualify as an employer may not be held personally liable under Title VII or the Kentucky Civil Rights Act). Nowhere in the Amended Complaint alleging that Powell violated K.R.S. 344.040, the Plaintiffs' Motion to Remand, which does not address the issue of preemption at all and only

discusses IIED as a viable claim against Powell, or in any affidavits do the Plaintiffs allege that Powell qualifies as an employer under the relevant statutes. Therefore, it would be impossible for the Plaintiffs to prevail against Powell on a claim for violation of K.R.S. 344.040.

This Court concludes that there is no colorable claim against Powell by any Plaintiff in this case. Accordingly, joinder was fraudulent and this Court has jurisdiction over this action.

### III.     DEFENDANTS' PARTIAL MOTION TO DISMISS

The Plaintiffs, in responding to the Defendants' Motion to Remand, introduced affidavits from almost all Plaintiffs in support of their position and incorporated those affidavits in their Response to Defendants' Motion to Dismiss. [DE 10]. All parties having addressed these affidavits and this Court will consider them in ruling on the motion to dismiss. Accordingly, Defendants' partial motion to dismiss is treated as a motion for partial summary judgment. Fed. R. Civ. P. 12(d).

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to

demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (citations omitted).

For the same reasons discussed regarding fraudulent joinder, the Plaintiffs do not have a colorable claim for intentional infliction of emotional distress against the Defendants, as the evidence provided in support of their position (i.e., the affidavits), even when taken in the light most favorable to the Plaintiffs, is not sufficient to send the case to the jury. Powell's conduct does not rise to the level considered actionable by Kentucky courts. While the Plaintiffs allege a series of bad acts performed with improper motives, this conduct does not constitute "outrageous" acts under Kentucky law. Consequently, no jury could reasonably find in favor of the Plaintiffs on their claim of outrage. Summary judgment for Defendants on this issue is proper under Rule 56.

Additionally, as the Defendants correctly note, no claim for outrage as a separate tort can be sustained under Kentucky law against an employer for discriminatory conduct or hostile work environment, as the KCRA subsumes such claims. The KCRA includes provisions relating to the infliction of emotional distress by an employer stemming from employment discrimination and, therefore, provides the exclusive remedy. *See* K.R.S. 344.020(b) (securing protection of personal dignity and freedom from humiliation); K.R.S. 344.450 (providing remedy for violations of Chapter 344 generally); *Wilson v. Lowe's Home Center*, 75 S.W.3d 229, 239 (Ky. Ct. App. 2001) (Wilson's IIED claims against Lowe's were superseded by K.R.S. Chapter 344). It is impossible for Plaintiffs to prevail on a separate claim that is completely preempted by statute. Accordingly, summary judgment must be granted on any outrage claims against the defendant employer.

Likewise, the KCRA also bars claims against individuals who are not employers, but who violate the Act. *See Conner v. Patton*, 133 S.W.3d 491 (Ky. Ct. App. 2004) The Plaintiffs did not respond to the Defendants' preemption issue raised in the Notice of Removal and make no attempt to show that Powell might qualify as an employer. As such, the Court cannot find that reasonable minds could differ as to Powell's liability. Accordingly, summary judgment is granted to Powell under the KCRA. There being no viable claim against Powell remaining, this Court will dismiss him as a party to this action.

## IV. CONCLUSION

For the reasons set forth above, **IT IS ORDERED**:

A.  Plaintiffs' motion to remand [DE 5] is **DENIED**;

B.  Defendants' partial motion to dismiss [DE 3] is converted to a motion for partial summary judgment and is **GRANTED** in favor of **ALL DEFENDANTS** on Plaintiffs' claim of Intentional Infliction of Emotional Distress;

C.  Partial summary judgment is further **GRANTED** in favor of Defendant Kenneth Noble Powell regarding violations of K.R.S. 344.040; and

D.  Defendant Kenneth Noble Powell is **DISMISSED** as a party to this action.

This August 11, 2010.



Signed By:
*Karl S. Forester* KSF
United States Senior Judge